2024 IL App (1st) 220897-U

FIFTH DIVISION
February 9, 2024

No. 1-22-0897

NOTICE: This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Cook County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 12550182 |
| ALEXANDER MURRAY, | ) ) ) | Honorable Lindsay Huge, Judge Presiding. |
| Defendant-Appellant. | ) | |

JUSTICE MIKVA delivered the judgment of the court.
Presiding Justice Mitchell and Justice Lyle concurred in the judgment.

**O R D E R**

¶ 1   *Held*:   Where the parties agree that the trial court applied the wrong burden of proof at defendant's trial, but where the evidence presented was sufficient to support a finding of guilt beyond a reasonable doubt, defendant's conviction is reversed, and this matter is remanded for a new trial.

¶ 2   Following a bench trial, defendant Alexander Murray was convicted of failure to reduce speed to avoid an accident, a petty traffic offense. The lawyers for both sides, as well as the trial court judge, incorrectly believed that the State was required to prove the elements of that offense by a preponderance of the evidence.

¶ 3       On appeal, the parties agree that the correct burden of proof was beyond a reasonable doubt and that Mr. Murray's conviction cannot stand. The State urges us to remand this matter for a new trial because the evidence was sufficient to support a finding of guilt under the more stringent reasonable doubt standard. Mr. Murray asks us to reverse his conviction outright. He insists that the trial court made an express finding that the State failed to meet this higher standard and that, in any event, the evidence was not sufficient to find him guilty beyond a reasonable doubt. For the reasons that follow, we agree with the State and reverse and remand this matter for a new trial.

¶ 4                                        I. BACKGROUND

¶ 5       In connection with a fatal accident on July 21, 2018, Mr. Murray received a citation, under section 11-601(a) of the Illinois Vehicle Code (625 ILCS 5/11-601(a) (West 2016)), for "driving too fast for conditions; or failure to reduce speed to avoid an accident." The citation noted that the accident took place at 9:15 p.m. on the off-ramp to California Avenue from southbound Interstate 90, and that road conditions were wet, with visibility described as "night, rain."

¶ 6       Mr. Murray waived his right to a trial by jury and a bench trial was held on March 2, 2022.

¶ 7       David Templeton testified that he, his wife, and his mother were traveling back into the city from the suburbs at approximately 9:15 p.m. on July 21, 2018. When asked about the conditions that night, Mr. Templeton said, "the sun was starting to set, if not probably dusk," and there were "sort of scattered showers." Mr. Templeton was driving, and when he took the exit for California Avenue, he saw a man who had apparently had an accident and was lying on the ground in the middle of the ramp, about five feet away from a motorcycle, which was lying on the right shoulder line. Mr. Templeton pulled his car, a four-door sedan, to the left side of the ramp— approximately 100 yards from the highway but still behind the man—and put his hazard lights on. Mr. Templeton explained that there was a steep incline to the shoulder, so he could not pull off the

2

road completely; his car was sticking over the line about 1/8 of the way into the single lane of traffic. He believed, however, that there was still "plenty of room on the right side," such that a driver approaching his vehicle would not have had to swerve to avoid hitting him.

¶ 8     While still in his car, Mr. Templeton made eye contact with the man in the road, whom he described as "discombobulated." Mr. Templeton exited his vehicle and went around to the front of it to check on the man. When he was "maybe 5 feet" away, "a Tahoe or a Suburban came and hit [the man] and ran over his motorcycle." Mr. Templeton testified that this took place at the top of the inclined exit ramp, "before it start[ed] to descend down to the [traffic] light" at California Avenue.

¶ 9     Mr. Templeton was shown a photograph and agreed that it was a true and accurate depiction of the exit ramp. He was able to place markers on the photo showing where his car, the man, and the motorcycle were that night. Although the headlights of Mr. Templeton's car illuminated the road ahead, he was not sure if the light illuminated the man in the road because his car was over to the left with its lights shining parallel to the ramp while the man was to the right. He did, however, describe the area as well-lit by nearby streetlights.

¶ 10    Mr. Templeton testified that he was driving at what he felt was a safe speed that day. He knew the road could be slippery following a light rain.

¶ 11    When he exited his car to check on the man in the road, Mr. Templeton did not look to see if a car was coming because he assumed that, with his car pulled over with its hazard lights on and the motorcycle lying on the ground, any driver traveling along the ramp would stop. Mr. Templeton therefore did not see the SUV until it made contact with the man. He estimated that it was going 35 to 40 miles-per-hour at that point. Mr. Templeton heard no screeching tires and saw no skid marks in the road. He did not see the SUV swerve or attempt to swerve but he could not say

3

whether it had done so before it came into his line of sight. He watched as the SUV first ran over the man and then ran over his motorcycle.

¶ 12    Mr. Templeton explained that he was in a state of disbelief. When he realized the SUV was not stopping, he began to chase it down the ramp, screaming, "[S]top your car! Stop your car!" He chased it 30 to 40 yards down the hill, all the way to the stoplight. The windows of the SUV were down, and there were two men inside. The driver, whom Mr. Templeton identified in court as Mr. Murray, looked at him and said, "[D]ude, I am stopped," at which point Mr. Templeton told him, "[T]here is a guy under your F-ing car." Mr. Templeton then looked under the car and saw that the man "was sort of bent at the hip underneath [there], and his eyes were open and he sort of gasped."

¶ 13    Mr. Templeton acknowledged on cross-examination that he did not tell the officer at the scene how fast he thought Mr. Murray's vehicle was going; he did not remember being asked that question. He also did not tell the officer that he had not heard screeching tires. He acknowledged that he could not say whether Mr. Murry had tried to brake prior to colliding with the motorcyclist.

¶ 14    Carolina Soto testified that, at 9:15 p.m. on July 21, 2018, she was working as a server at the IHOP at California and Diversey Avenues. She went outside for a cigarette break and heard a loud noise and people screaming. She ran over to the off-ramp to see what had happened and saw people running toward a beige Tahoe and telling the driver to stop. Ms. Soto got to the vehicle first and told the driver, whom she identified in court as Mr. Murray, that there was somebody under his car. The windows of the Tahoe were down, and loud music was coming from inside. Ms. Soto said Mr. Murray "looked like he was kind of shocked" and "kind of looked spaced out." He "said that he was the designated driver, and his friend [had been] drinking." Ms. Soto testified that when she looked under the car, "the back of [the man's] head was touching the back of his feet," so "he was like squished inside."

¶ 15    Ms. Soto said she had an opportunity to see the entire road after the accident and did not recall seeing skid marks, though she added that she "[didn't] remember that part honestly." Ms. Soto was shown the same photograph of the area (with Mr. Templeton's indicators removed) and pointed out where the Tahoe had come to a stop.

¶ 16    On cross-examination, Ms. Soto agreed that she did not see the motorcycle accident. Nor did she see the Tahoe strike the motorcyclist or motorcycle. By the time she got there, there were "people not aware of the situation still coming down the ramp slowly." When asked if she knew how fast the Tahoe was going, Ms. Soto said it was going "pretty fast" and that it only began to slow down when onlookers started screaming at the driver. She acknowledged that she did not know if Mr. Murray had tried to brake earlier as he came down the ramp.

¶ 17    On redirect, defense counsel asked Ms. Soto if she could quantify the Tahoe's speed. The court interjected at this point, saying, "If I may, she has been asked this question by both Parties, but you understand what she is answering is what she knows and is not the speed o[f] the impact, right?" Counsel agreed, and Ms. Soto said, "Maybe like 15 miles-an-hour or something like that." She explained that Mr. Murray "was coming fast and then he started slowing down."

¶ 18    The State entered into evidence a digital copy of the photograph shown to the witnesses at trial (without the witnesses' position markers) and then rested its case.

¶ 19    The court denied defense counsel's motion for a directed finding, and the defense rested without presenting evidence.

¶ 20    In its closing argument, the State portrayed this as "a tale of two motorists," with Mr. Templeton as the "ideal" motorist and Mr. Murray as the motorist who had failed to exercise due care. The assistant state's attorney explained that it did not matter how fast Mr. Murray was actually going, saying:

"It doesn't matter how fast the Defendant was going at this time. It really doesn't. He could [have been] going any speed, Judge, because when you have these conditions, light rain, darkness, a person in the road, the reasonable speed is zero. You stop. You don't just keep on going. You don't swerve by a car that has it's hazard lights on and just cross your fingers and hope everything is okay at the end of the road.

This Defendant ignored all of that. Unreasonably came and hit this person in the road, dragged him down the road, and didn't stop until people had to come out and yell and wave at him."

¶ 21    Defense counsel argued that Mr. Murray did not see the motorcyclist "because Mr. Templeton put himself in the way." This prompted an exchange with the judge, who noted that the place on the photograph where Mr. Templeton's car was supposed to have been was to the left of where the motorcyclist was lying in the road. Counsel then argued that in order to avoid hitting Mr. Templeton's car, Mr. Murray had had to swerve to the right, causing him to make contact with the motorcyclist. Counsel argued that a failure to reduce speed could not be inferred here simply because there was a collision and faulted the State for failing to show how fast Mr. Murray was going at the time of the collision.

¶ 22    In rebuttal, the State argued that the impact of running over a person and a motorcycle would be felt inside a vehicle, and the fact that Mr. Murray did not stop but continued to go down the road and drag the victim was "circumstantial evidence that he was going at a high rate of speed."

¶ 23    The court found Mr. Murray guilty as charged. The judge explained: "I can not [*sic*] find any other result in a finding of guilty for this offense by upon preponderance of the evidence, even certainly if there is a reasonable doubt." The judge also said she was "thankful that Mr. Templeton

did not enter the middle of that roadway" because "the way Mr. Murray was driving," it "seem[ed] tht [sic] there [was] nothing apparent for Mr. Murray to stop."

¶ 24    Mr. Murray's motion for a new trial was denied on April 15, 2022. In ruling on the motion, the court noted that section 11-601(b) of the Code "really addresses two different potential violations," driving too fast for conditions and failing to reduce speed when there is a hazard in the road. For the latter, the court explained, speed was "indeterminate." The State's failure to quantify Mr. Murray's actual rate of speed did not matter because he "failed to reduce speed given what was in the road"—namely, "a car with the hazard lights on, a person walking in front of that car, a body laying in the middle of the road, and a motorcycle on its side, on the right side of the lane." The court noted that, without the benefit of another vehicle's hazard lights, Mr. Templeton had "stopped his car, turned on his hazard lights, [and] got out to check the scene," indicating to the court that there was a hazard in the road that a reasonable observer should have seen and appreciated.

¶ 25    The trial court sentenced Mr. Murray to 12 months of conditional release, a $500 fine, and 175 hours of community service. Mr. Murray now appeals.

¶ 26                                   II. JURISDICTION

¶ 27    Mr. Murray was sentenced on April 29, 2022, and his motion for a new trial was denied the same day. Later that same day, he timely filed his notice of appeal in this matter. We have jurisdiction under article VI, section 6, of the Illinois Constitution (Ill. Const. 1970, art. VI, § 6) and Illinois Supreme Court Rules 603 (eff. Feb 6, 2013) and 606 (eff. March 12, 2021), governing appeals from final judgments in criminal cases.

¶ 28                                   III. ANALYSIS

¶ 29    On appeal, Mr. Murray argues that his conviction for failing to reduce speed to avoid an

accident cannot stand where the trial court applied the wrong burden of proof—proof of guilt by a preponderance of the evidence rather than beyond a reasonable doubt. The State agrees. While municipal traffic violations, which are punishable by fines, historically need only be proved by a preponderance of the evidence (*City of Chicago v. Hertz Commercial Leasing Corp.*, 71 Ill. 2d 333, 351-52 (1978)), statutory traffic offenses must be proved beyond a reasonable doubt, just as in any other criminal case (*People v. Mindock*, 128 Ill. App. 2d 196, 199 (1970)). Our supreme court has made clear that a conviction for failing to reduce speed to avoid an accident under section 11-601(a) of the Code must be based on proof beyond a reasonable doubt. *People v. Galarza*, 2023 IL 127678, ¶ 29.

¶ 30    Although Mr. Murray never objected to the trial court's application of the preponderance standard and did not raise this issue in his post-trial motion, the State acknowledges that it is reviewable as second-prong plain error and that this conviction cannot stand. See *People v. Piatkowski*, 225 Ill. 2d 551, 565 (2007) (noting that a second-prong plain error is a "clear or obvious error" that "is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence").

¶ 31    Mr. Murray also argues that his sentence of 12 months of supervised release exceeded the maximum sentence provided by statute for failing to reduce speed to avoid an accident, which is 6 months of supervised release (730 ILCS 5/5-4.5-75(b) (West 2016)). The State agrees with this too. In the event of a retrial, it acknowledges that the longest sentence Mr. Murray could receive for this offense would be 6 months of supervised release.

¶ 32    The only contested issue, then, is whether we should remand this matter for a new trial or reverse Mr. Murray's conviction outright. As a general rule, "[t]he double jeopardy clause does not preclude retrial of a defendant whose conviction is overturned because of an error in the trial

proceedings leading to the conviction." *People v. Casler*, 2020 IL 125117, ¶ 57. But here Mr. Murray also challenges the sufficiency of the evidence at his first trial. If he is correct, and the evidence was insufficient to support his conviction, a second trial would impermissibly afford the State "another opportunity to supply evidence which it failed to muster in the first proceeding." (Internal quotation marks omitted.) *People v. Taylor*, 76 Ill. 2d 289, 309 (1979).

¶ 33    Mr. Murray insists that the trial court in this case made a finding on the record that there was reasonable doubt of his guilt. But we do not read the court's statement—that it found Mr. Murray guilty by a preponderance of the evidence, "*even certainly if there* [*was*] *a reasonable doubt*" (emphasis added)—as a finding that the State failed to prove Mr. Murray's guilt beyond a reasonable doubt. There would be no reason for the trial court to make such a finding. The most natural reading of the trial court's statement is that, *even if* the State failed to prove Mr. Murray guilty beyond a reasonable doubt (a question that the court had no need to resolve), the State had certainly proven Mr. Murray's guilt by a preponderance of the evidence.

¶ 34    We thus turn to the sufficiency of the evidence itself. When a criminal conviction is challenged based on insufficient evidence, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." (Emphasis in original.) *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). We will find the evidence insufficient only where it is "so unreasonable, improbable, or unsatisfactory as to justify a reasonable doubt as to the defendant's guilt." *People v. Brown*, 2013 IL 114196, ¶ 48.

¶ 35    Section 11-601(a) of the Code provides:

> "No vehicle may be driven upon any highway of this State at a speed which is greater than is reasonable and proper with regard to traffic conditions and the use of the

highway, or endangers the safety of any person or property. The fact that the speed of a vehicle does not exceed the applicable maximum speed limit does not relieve the driver from the duty to decrease speed when approaching and crossing an intersection, approaching and going around a curve, when approaching a hill crest, when traveling upon any narrow or winding roadway, or when special hazard exists with respect to pedestrians or other traffic or by reason of weather or highway conditions. Speed must be decreased as may be necessary to avoid colliding with any person or vehicle on or entering the highway in compliance with legal requirements and the duty of all persons to use due care." 625 ILCS 5/11-601(a) (West 2016).

Our supreme court has held that to prove a defendant guilty of failing to reduce speed to avoid an accident under this provision, the State must establish beyond a reasonable doubt that the defendant failed to exercise due care and failed to reduce his or her speed to avoid a collision. *Galarza*, 2023 IL 127678, ¶ 29. Due care is "that degree of care which ordinarily prudent persons are accustomed to exercise under the same or similar circumstances." (Internal quotation marks omitted.) *Id.* ¶ 33.

¶ 36     The evidence that the State presented supported a finding that a reasonable driver would have noticed the obstacles ahead—a parked car with its hazards on, a man lying in the road, a second man walking to aid the first man, and a motorcycle lying in the road—and would have slowed or stopped to avoid hitting those obstacles. It is a reasonable inference from the evidence that Mr. Murray did not try to stop even after driving over a person and, separately, that person's motorcycle. There was uncontradicted evidence that he had to be flagged down by several bystanders and told what had happened. This supported a finding beyond a reasonable doubt that Mr. Murray was not exercising due care and failed to slow to avoid this fatal collision with the motorcycle driver.

¶ 37    Mr. Murray points out there was no evidence that he was speeding or evidence as to how fast he was going. However, as this court noted in *People v. Harrison*, 201 Ill. App. 3d 65, 66 (1990), "one can commit this offense at any speed, even when driving below the speed limit." The statute itself says that: "The fact that the speed of a vehicle does not exceed the applicable maximum speed limit does not relieve the driver from the duty to decrease speed" in certain circumstances including "when special hazard exists with respect to pedestrians or other traffic." 625 ILCS 5/11-601(a) (West 2016).

¶ 38    Mr. Murray also argues that the evidence showed that he did slow down. He points to the fact that Mr. Templeton estimated that Mr. Murray was driving between 35 and 40 miles per hour when he struck the motorcyclist, and Ms. Soto, who only saw his vehicle later, when it had made its way down the rest of the ramp, testified that Mr. Murray was going "[m]aybe like 15 miles-an-hour or something like that." She said he "was coming fast and then he started slowing down" when onlookers chased him and yelled at him.

¶ 39    The question here, however, is not whether Mr. Murray slowed his vehicle in a reasonable manner for someone traveling down an off-ramp terminating in a traffic-control device. The question is whether he slowed his vehicle in a reasonable manner for someone presented with multiple obstacles in the roadway. The State presented evidence that he did not. Mr. Templeton testified that Mr. Murray was going 35-40 miles-per-hour at the time of impact. He watched as Mr. Murray first ran over the motorcyclist, then ran over the motorcycle, and continued without stopping for 30-40 yards, or until he reached the end of the off-ramp. On another day, with no obstacles present, that may have been perfectly reasonable. But section 11-601(a) of the Code requires a driver to proceed at a speed which is reasonable and proper "with regard to traffic conditions" and to slow as necessary "when special hazard exists." The fact that Mr. Murray

11

eventually slowed and stopped his vehicle does not rebut the State's evidence that he failed to respond appropriately to specific hazards.

¶ 40    Mr. Murray notes other cases in which skid marks were present at the scene, providing circumstantial evidence that the defendant's vehicle was traveling at a high rate of speed (see, *e.g.*, *Watkins v. Schmitt*, 172 Ill. 2d 193, 208 (1996)), and points out their absence here. Mr. Murray's reliance on the absence of skid marks is misplaced. Skid marks reflect a driver's attempt to slow down. Here, there was no evidence that Mr. Murray slowed down or attempted to slow down, either before or after he hit the motorcyclist and motorcycle. This is no way undermines the evidence of guilt in this case.

¶ 41    Mr. Murray also points out that, unlike in *Galarza*, there was no damage to his vehicle and his airbags never deployed. But the defendant in *Galarza* collided with an upright object—a tree. *Galarza*, 2023 IL 127678, ¶ 40. Mr. Murray drove *over* a man and a motorcycle that were lying in the street. He was also driving a large SUV. The lack of damage to his vehicle does not give rise to any inference that negates a finding of guilt.

¶ 42    Mr. Murray argues that the hazards the court found he should have slowed to avoid were not visible. He claims that it was not dusk, as Mr. Templeton testified, but dark. Mr. Murray asks this court to take judicial notice of official government records showing that, by 9:15 p.m., when the impact occurred, the sun had fully set. He points to testimony that Mr. Templeton's headlights would not have illuminated the motorcyclist or his motorcycle. However, Mr. Murray's argument ignores the evidence that Mr. Templeton's vehicle, with its hazard lights on, would have been visible to an approaching driver, no matter how dark it might have been.

¶ 43    Mr. Murray insists that it is equally reasonable to infer from the testimony in this case that he was traveling at a safe speed and only hit the motorcyclist and motorcycle because he had to

12

swerve to avoid Mr. Templeton and Mr. Templeton's car. This scenario, however, is inconsistent with Mr. Murray's behavior after he passed Mr. Templeton's car. It is reasonable to infer that a driver alert enough to see an obstacle in the road and swerve to avoid it would slow his vehicle in the immediate aftermath of that close call or, at the very least, be cognizant of the fact that the act of swerving had caused him to strike two other obstacles. The testimony here was that, although Mr. Murray's vehicle eventually slowed and came to a stop at the end of the off-ramp, he made no immediate effort to stop his vehicle post-impact. He instead continued on his way, dragging a man beneath his car until flagged down by bystanders. This was not the conduct of an alert driver forced into a last-second maneuver.

¶ 44    Finally, Mr. Murray argues that by comparing his behavior to that of Mr. Templeton, the State held him to an unduly high standard of care, rather than to the standard of care that a reasonably prudent person would exercise in similar circumstances. The State, in argument, described what Mr. Templeton first did in pulling over to the side of the road as "what every motorist should do." The trial court referenced Mr. Templeton's behavior as evidence that there was a hazard in the road that a reasonable observer would have seen and should have responded to.

¶ 45    There is nothing to support Mr. Murray's claims that he was held to too high a standard of care. Even if, as Mr. Murray claims, the State's position was that a reasonable driver would have stopped and pulled off the road, the evidence in this case was that Mr. Murray did not even slow down in response to the hazards ahead of him. Thus, the evidence supported a finding that he did not respond reasonably, even if reasonable care did not require him to conduct himself as Mr. Templeton did.

¶ 46    In sum, after viewing the evidence in the light most favorable to the State, we conclude

that a rational trier of fact could have found that the State proved the essential elements of the offense of failure to reduce speed to avoid an accident beyond a reasonable doubt. Double jeopardy is thus no bar to retrial.

¶ 47    Mr. Murray makes a short additional argument that the trial judge improperly relied on her experience as a motorcyclist to assume facts not in evidence. We need not address this argument. If this occurred, it was at most a trial error that could necessitate a new trial. We have already concluded, and indeed the State agrees, that Mr. Murray is entitled to a new trial.

¶ 48                                VI. CONCLUSION

¶ 49    For the above reasons, we reverse Mr. Murray's conviction for failing to reduce speed to avoid an accident and remand this matter for a new trial.

¶ 50    Reversed and remanded.